JOHN M. GINGERICH, Plaintiff, and JOEL GINGERICH, GEORGE RHODES, LENA SNIDER, KATIE RHODES, and SUSAN YODER, Intervenors, Plaintiffs, Appellants, v. JOSEPH D. MILLER, PETER D. MILLER, JOHN D. MILLER, and SAMUEL D. MILLER, Defendants, Appellees.

**Conveyances:** MENTAL INCAPACITY: FRAUD: EVIDENCE. In this action
1   to set aside a deed on the ground of mental incapacity, fraud and undue influence, the evidence is held insufficient to sustain the allegations of the petition.

**Same:** CONSIDERATION. Where a testator gave his widow the life use
2   of the homestead, with the remainder to his sons by a former wife, a conveyance by the widow to the remaindermen was an election to take under the will, which was a sufficient consideration for the deed, she having at the time an actual life expectancy of several years.

**Same:** CONVEYANCE OF LIFE ESTATE: FRAUD. A conveyance by the
3   widow of the homestead, in which she was given a life estate, to the remaindermen in conformity with the provisions of the will was not a fraud upon her children by another marriage; their interests not being involved in a legal sense.

*Appeal from Johnson District Court.*—HON. R. P. HOWELL, Judge.

SATURDAY, MARCH 14, 1914.

SUIT in equity to set aside a deed on the ground of mental incapacity of the grantor, and on the ground of fraud, undue

influence, and duress. There was a decree for the defendants, and the plaintiff and interveners appeal.—*Affirmed.*

*A. E. Maine* and *Ranck & Messer,* for appellants.

*Wade, Dutcher & Davis,* for appellees.

Evans, J.—The plaintiff and the interveners are the six children and heirs at law of Mary Miller, who died in 1911. At the time of her death, and for three months previous, she was the widow of D. P. Miller, who died testate on March 21, 1911. The defendants are the four sons and only heirs of D. P. Miller, being his children by a former marriage. D. P. Miller and Mary Miller were married in 1885; both having children by their former marriages. Mary Miller had been twice married previously, and had six children, ranging in age from five years upwards, the younger of which became members of the new household. The land involved in the action consists of forty acres, and was the homestead of D. P. Miller and Mary Miller from the date of their marriage until the death of the husband, and continued to be the homestead of Mary Miller up to the time of her death. It comprises all the real estate owned by D. P. Miller at the time of his death. The will of D. P. Miller, made in 1908, provided that the widow should take such homestead during her life, and that the remainder should go to the four sons, the defendants herein. The deed complained of in this case conformed in its provisions to such provisions in the will.

The grounds of attack laid in the petition are (1) that at the time of the execution of the deed Mary Miller was insane, being wholly deprived of her reason, and was therefore incapable of any binding act on her part; (2) that the deed in question was obtained from her by undue influence, fraud, and coercion or duress.

We are clear that a fair consideration of the evidence pro and con does not sustain the claim of insanity. In view of our

discussion of the second ground, we will not enter into detailed discussion of the first.

Even though Mrs. Miller was not insane, her actual condition, both mental and physical, whether weak or strong, still remains to be considered as bearing upon the question

1. CONVEYANCES: mental incapacity: fraud: evidence.

of undue influence, fraud, or duress. In December, 1910, Mrs. Miller's oldest daughter (Mrs. Yoder) and her family came to live in the Miller home. In January following Mrs. Miller was sick for three or four weeks with pneumonia. On March 21st Mr. Miller died after an illness of a little more than a week. Mr. Miller's four sons attended the funeral. Three of them were nonresidents. Joe lived on his farm in the home community. Peter lived in Colorado, John in Oklahoma, and Samuel in Florida. After the funeral they remained for several days looking into the business of the estate. Joe was named as executor in the father's will. On Friday, March 24th, the will was read at the home. On Monday, March 27th, the deed complained of was executed. It was executed in the "sitting room" of the home, and was witnessed by Mrs. Miller's son-in-law, Yoder, and one Skola, a banker. No direct evidence is introduced of any fraud, or undue influence, or duress. The circumstances relied on in proof of such claim are that there was no consideration for the deed; that Mrs. Miller was physically and mentally weak normally, and was still more so by reason of her previous sickness, and her grief over the loss of her husband; that her daughter, Mrs. Yoder, was in the kitchen of the house engaged about her work, and was not invited in, but, on the contrary, the door between the sitting room and kitchen was closed; that the deed was prepared in advance in typewriting by Skola before coming to the Miller home, and that it was later executed as so prepared; there were other papers executed at the same time which are not directly involved in this suit, but have an incidental connection with the subject-matter, and these also were prepared in advance in typewriting by Skola.

As to the consideration, the deed recited a nominal consideration of $1. The body of the deed, however, shows that the real consideration was mutual between the grantor

2. SAME: consideration.

and grantees, and that the grantees only took the remainder in fee, whereas, the grantor took a life use of the tract. One of the fallacies of appellant's argument is that it has assumed that the life use of the whole was without value, and that the conveyance by the grantor was a mere gift. Under no circumstances could Mrs. Miller have retained a fee in one-third, and yet retained a life use of the whole. She had the right of election, and the execution of this deed amounted to no more than such right of election. If she elected manifestly to her own disadvantage, it is a circumstance proper to be considered on the question of fraud or duress. She was seventy years of age at the time of the death of her husband. Her natural expectancy was about nine years. From the point of view of March 27th, therefore, the life use of the whole premises was of very substantial value, nor can it be said upon this record that it was of any less value than the one-third in fee. The consideration for the deed was therefore ample, and furnishes no ground of attack.

As to the immediate circumstances surrounding the execution of the deed, Mr. Skola was the banker of Mr. and Mrs. Miller, and was one of the witnesses to Mr. Miller's will. He prepared the papers at his bank before coming, having been informed by one of the Millers what they proposed to do. Mrs. Miller was advised of what she was signing, and that the effect of the papers was the same as the will. Mr. and Mrs. Yoder testified that the door between the sitting room and kitchen was closed for twenty minutes while three of the brothers and Skola were in the sitting room with the mother. Nevertheless Yoder was called in to witness the execution of the papers, and he also understood that they were in conformity with the will. The other papers heretofore referred to conformed to other provisions of the will in behalf of Mrs. Miller. The will provided that she should take one-third of

the live stock and $1,000. The sum of $1,000 was paid to her on March 27th, and her receipt taken therefor. An agreement was also signed providing for a public sale of the live stock. This was subsequently held, and one-third of the proceeds was paid to Mrs. Miller, viz., $243. The evidence shows that Mrs. Miller was acquainted with the terms of her husband's will during his life, and was then satisfied therewith. It further shows that subsequent to March 27th she spoke of the settlement between her and the Millers, and expressed herself as satisfied therewith.

Mrs. Miller and her husband were members of a religious sect known as Amish Mennonites. They were German people, and she preferred the German language. She could not read English, nor could she sign her name. She had a deformity known as a "hump-back." She weighed about 125 pounds. That she was not as strong, either physically or mentally, after her January sickness, and after the death of her husband, may be assumed. This, however, avails little without showing that she was in some manner over-reached. Counsel for appellants measure the benefits accruing to Mrs. Miller under the contract in the light of the subsequent fact that she died on July 4th. This is not the proper criterion. So far as the parties knew on March 27th, she would probably live about nine years, and might live many years longer.

It is charged in the petition, and urged in argument, that the deed under consideration was a fraud upon the children of Mrs. Miller. This contention is clearly wrong, and furnishes no ground of attack upon the deed. The interests of her children were not involved in a legal sense. What might have been to their interest might also have been to her detriment. It was her legal right to consider her own interest alone. It was also her privilege to regard the wishes of her husband and the moral claims of his family by the first marriage. The property involved was acquired during the first marriage. She was not legally bound to respond to these considerations; neither was

3. SAME: conveyance of life estate: fraud.

she forbidden to adopt a conscientious course from a moral and religious point of view. She was not otherwise destitute in her occupancy of the homestead; the inventory of her estate showing money and credits to the amount of more than $2,000.

Giving the evidence as a whole our most careful consideration, we think the conclusion is unavoidable that no fraud or duress is shown. The decree of the trial court must therefore be—*Affirmed.*

LADD, C. J., and WEAVER and PRESTON, JJ., concur.